**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MICHAEL EMERSON, ESTATE OF ALBERTS C. ROBERTS BY BRIAN ROBERTS, ADMINISTRATOR AD PROSEQUENDUM, AND ESTATE OF MICHELE DESBIENS BY PAUL DESBIENS, ADMINISTRATOR AD PROSEQUENDUM, individually and on behalf of themselves and all other similarly situated,

*Plaintiffs*,

v.

ANDOVER SUBACUTE REHABILITATION CENTER I, ANDOVER SUBACUTE REHABILITATION CENTER II, ALTITUDE INVESTMENTS, LTD; ALLIANCE HEALTHCARE, HEALTHCARE SERVICES GROUP, JOHN DOES 1 through 100 said names being fictitious and unknown persons, and ABC CORPORATIONS 1 through 100, said names being fictitious and unknown entities,

*Defendants*.

Civil Action No.: 2:20-cv-20066-SDW-LDW

MOTION RETURN DATE: June 14, 2021

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION AND IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
One Riverfront Plaza, 8th Floor
Newark, New Jersey 07102.

*Of Counsel and on the Brief:*
Malinda A. Miller, Esq.

*On the Brief*
Alex W. Raybould, Esq.
S. Christopher Martino, Esq.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ *ii*

**PRELIMINARY STATEMENT** ........ 1

**LEGAL ARGUMENT** ........ 1

**I. THE SUBSTANCE OF A CLAIM AND NOT ITS LABEL DETERMINES THE REQUISITE PROOFS AND RELEVANT STATUTES.** ........ 1

**II. PLAINTIFFS' CLAIMS ARE BARRED BY THE PREP ACT.** ........ 6

**III. THE PREP ACT IS A COMPLETE PREEMPTION STATUTE.** ........ 7

**IV. BECAUSE PLAINTIFFS' CLAIMS TRIGGER THE PREP ACT, PLAINTIFFS WERE OBLIGATED, AND FAILED, TO EXHAUST THEIR ADMINISTRATIVE REMEDIES THEREBY DEPRIVING THIS COURT OF JURISDICTION.** ........ 9

**V. THE NEW JERSEY COVID IMMUNITY STATUTE BARS PLAINTIFFS' CLAIMS.** ........ 11

**VI. THE NJ CONSUMER FRAUD ACT DOES NOT APPLY TO DEFENDANTS BASED ON THE LEARNED PROFESSIONAL EXCEPTION.** ........ 13

**CONCLUSION** ........ 15

## TABLE OF AUTHORITIES

**Cases**

*Adams v. U.S. Capitol Police Bd.*,
564 F.Supp. 2d 37 (D.D.C. 2008) .....11

*Aiello v. Muhlenberg Reg'l Med. Ctr.*,
159 N.J. 618 (1999) .....3

*Ashcroft v. Iqbal*,
556. U.S. 662 (2009) .....2

*Atlantic Ambulance Corp. v. Cullum*,
451 N.J. Super. 247 (App. Div. 2017) .....14

*Charles A. Manganaro Consulting Eng'rs, Inc. v. Carneys Point Twp. Sewerage Auth.*,
344 N.J. Super. 343 (App. Div. 2001) .....3

*Couri v. Gardner*,
173 N.J. 328 (2002) .....2, 3

*Daaleman v. Elizabethtown Gas Co.*,
77 N.J. 267 .....14

*Dupervil v. Alliance Health Operations, LCC*,
2021 WL 355137 (E.D.N.Y. Feb. 2, 2021) .....7, 8

*Garcia v. Welltower OpCo Group*,
2021 U.S. Dist. LEXIS 257838 (C.D. Cal. Feb 10, 2021) .....7, 8

*Hampton Hosp. v. Bresan*,
288 N.J. Super. 372 (App. Div. 1996) .....13

*Hill Int'l, Inc. v. Atl. City Bd. of Educ.*,
438 N.J. Super. 562 (App. Div. 2014) .....2

*Maglioli v Andover Subacute Rehab Ctr. I*,
478 F. Supp. 3d 518 (D.N.J. Aug 12, 2020) .....6, 7, 8

*Manahawkin Convalescent v. O'Neill*,
426 N.J. Super. 143 (App. Div. 2012) aff'd, 217 N.J. 99(2014) .....14

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,
418 F.3d 535 (5th Cir. 2005) .....8

*Ptaszynski v. Atl. Health Sys., Inc.*,
440 N.J. Super. 24, 39-40 (App. Div. 2015) (cert. denied, 227 N.J. 357 (2016)........................5

*Rachal v. Natchitoches Nursing & Rehabilitation Center, LLC*,
No. 1:21-cv-0034-DCJ-JPM (W. D. La. Apr. 30, 20201) ......................................................7

*Ross v. Blake*,
136 S.Ct. 1850 (2016)..........................................................................................................11

*In re WTC Disaster Site*,
414 F.3d 352 (2d Cir. 2005)...................................................................................................8

**Statutes**

42 U.S.C. § 247d-6(d)...........................................................................................................9

42 U.S.C. § 247d-6(e)...........................................................................................................9

42 U.S.C. § 247d-6e(a) .......................................................................................................10

N.J.S.A. 2A:53A-27..............................................................................................................2

N.J.S.A. 30:13-5(a)-(c) .........................................................................................................5

N.J.S.A. 30:13-5(j).................................................................................................................5

N.J.S.A. 30:13-8(a) ....................................................................................................... 4, 14f

New Jersey Consumer Fraud Act .......................................................................................13

New Jersey Nursing Home Act............................................................................................14

NJ COVID Immunity Law....................................................................................................11

PREP ACT .......................................................................................3, 6, 7, 8, 9, 10, 11

Air Transportation Safety and System Stabilization Act of 2001...........................................8

Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101) ..................................8

**Treatises**

Wright & Miller, 5B Fed. Prac. & Proc. § 1350, n. 5 (3d ed.) ...................................................11

**Other Authorities**

*https://nj.gov/health/legal/covid19/3-31-2020%20Hospital%20Discharges%20and%20Admissions%20to%20Post-Acute%20Care%20Settings.pdf* ...........................................................................13

## PRELIMINARY STATEMENT

Plaintiffs again recharacterize the allegations in their complaint in an effort to evade defendants' motion. Plaintiffs have already filed two complaints in an effort to avoid defendants' statutory defenses. But the central allegation of the complaint -- regardless of plaintiffs' rephrasing *du jour* -- is that defendants' provision of a purported "substandard level of care caused [plaintiffs] to suffer serious physical harm" (ECF 15, ¶18). For plaintiff Emerson, this culminated in his "contract[ing a]…..communicable disease due to defendants' inadequate infection control protocols"; that is, as a result of defendants' alleged negligence "Emerson contracted COVID-19 while under the sole care of Defendants." (ECF 15, ¶¶ 19a). Virtually identical allegations are made with respect to plaintiffs Desbiens and Roberts. (ECF 15, ¶¶ 22b, 1 and 25b, c-e). This case is therefore a professional malpractice action seeking personal injury damages. If plaintiffs narrow the scope of the complaint by waiving any recovery for personal injury damages then, and only then, do their arguments have any merit. Otherwise, no matter how they replead or recharacterize their claims, this is a personal injury action arising out of defendants' alleged negligent use and allocation of scarce PPE in responding to the pandemic purportedly resulting in plaintiffs' and their decedents' COVID-19 infections and physical injury. As such, the PREP Act, which has now been recognized as a complete preemption statute, as well as the New Jersey COVID-19 statute confer immunity on defendants for the present claims.

## LEGAL ARGUMENT

### I. THE SUBSTANCE OF A CLAIM AND NOT ITS LABEL DETERMINES THE REQUISITE PROOFS AND RELEVANT STATUTES.

Plaintiffs go to great lengths to characterize the present mater as seeking recovery solely under the Federal and New Jersey Nursing Home Acts, specifically for alleged violations of Resident's Rights. Plaintiffs even recount alleged incidents going back to early 2018 relating to an

alleged skin cancer diagnosis and stent placement for Desbiens. Not only are these allegations largely irrelevant, but any cause of action arising out of them is barred by the statute of limitations as set forth in Defendants' moving papers. The simple fact is that the present complaint seeks damages for personal injury, including death, arising out of defendants' purported negligence in responding to and limiting the transmission of COVID-19. The substance of these allegations control rather than the label applied by plaintiffs in a strategic effort to stave off immunity. Courts can and do look beyond the plain text of the complaint to the actual substance of any allegations, using "judicial experience and common sense" when assessing a dismissal motion. Ashcroft v. Iqbal, 556. U.S. 662, 679 (2009).

For example, in the context of determining whether an Affidavit of Merit was required the New Jersey Supreme Court held, "[i]t is not the label placed on the action that is pivotal but the nature of the legal inquiry." Couri v. Gardner, 173 N.J. 328, 340 (2002). In making this determination, the court "shall consider the actual substance of those allegations and the related evidence as developed through pertinent discovery, rather than simply accept the label used for them in [the] pleadings." Hill Int'l, Inc. v. Atl. City Bd. of Educ., 438 N.J. Super. 562 (App. Div. 2014), leave to appeal granted, 221 N.J. 283 (2015).  The Court in Couri noted:

> There are three elements to consider when analyzing whether the statute applies to a particular claim: (1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint fell outside acceptable professional or occupational standards or treatment practices" (standard of care). N.J.S.A. 2A:53A-27

Id. at 340.  There is no question these three requirements are satisfied here, confirming that this is a professional malpractice action seeking to recover personal injuries.  Consequently, statutes that

weed out such meritless lawsuits or that immunize healthcare providers for actions taken responding to the COVID-19 pandemic apply.

In this case, the complaint demands damages for "serious physical harm" for plaintiff Emerson "contract[ing]…..communicable disease due to defendants' inadequate infection control protocols" -- namely, COVID. (ECF 15, ¶¶ 18 19a, 19d). Virtually identical allegations are made with respect to plaintiff Desbiens and Roberts. (ECF 15, ¶22b, l and 25b, c-e). These allegations clearly satisfy the first prong under Couri insofar as they clearly seek damages for personal injuries. As for the second element, the complaint alleges that defendants provided a "substandard level of care caused them [plaintiffs] to suffer" (ECF 15, ¶18). The substandard level of care refers to alleged negligence in the operation of a licensed long-term care facility involving decisions by nurses, physicians and other medical professionals. Therefore, despite the name given to the cause of action, the claim rests upon allegations of a duty to exercise "reasonable medical skill and judgment" and a breach of that duty that precluded the exercise of reasonable medical judgment. Because these are indisputably elements of a professional negligence action, the second Couri element is satisfied as well. See Aiello v. Muhlenberg Reg'l Med. Ctr., 159 N.J. 618, 626 (1999); Charles A. Manganaro Consulting Eng'rs, Inc. v. Carneys Point Twp. Sewerage Auth., 344 N.J. Super. 343, 347-48 (App. Div. 2001). Finally, as to the third element, plaintiffs specifically refer to a "substandard level of care" provided to them by a licensed long-term care facility "[which] caused [plaintiffs] to suffer". (ECF 15, ¶18). Plaintiffs have therefore conceded that the allegations of this matter arise out of care provided (or allegedly not provided) by defendants in the operation of a licensed long-term care facility. If they had not, plaintiffs would not be trying to now recraft medical malpractice as alleged violations of statutory rights. As such, all the Couri factors are satisfied, confirming that this is a professional negligence action triggering the applicability of certain statutory defenses applicable to their claims, including the PREP ACT, the NJ COVID Immunity Statute and the AOM requirement.

Recognition that this matter is a personal injury action arising out of alleged professional malpractice in the operation of a licensed long-term care facility is even more apparent when the actual rights protected are identified. Specifically, the NHA's private right of action provision, N.J.S.A. 30:13-8(a), states that "[a]ny person or resident whose ***rights*** as defined herein are violated shall have a cause of action ***against any person committing such a violation*** (emphasis added)." N.J.S.A. 30:13-5, in turn, sets forth a "bill of rights" of nursing home residents, as follows:

> Every resident of a nursing home shall:
>
> a. Have the right to manage his own financial affairs unless he or his guardian authorizes the administrator of the nursing home to manage such resident's financial affairs. Such authorization shall be in writing and shall be attested by a witness that is unconnected with the nursing home, its operations, its staff personnel and the administrator thereof, in any matter whatsoever.
>
> b. Have the right to wear his own clothing. If clothing is provided to the resident by the nursing home, it shall be of a proper fit.
>
> c. Have the right to retain and use his personal property in his immediate living quarters, unless the nursing home can demonstrate that it is unsafe or impractical to do so.
>
> d. Have the right to receive and send unopened correspondence and, upon request, to obtain assistance in the reading and writing of such correspondence.
>
> e. Have the right to unaccompanied access to a telephone at a reasonable hour, including the right to a private phone at the resident's expense.
>
> f. Have the right to privacy.
>
> g. Have the right to retain the services of his own personal physician.
>
> h. Have the right to unrestricted communication, including personal visitation with any persons of his choice, at any reasonable hour.
>
> i. Have the right to present grievances on behalf of himself or others to the nursing home administrator, State governmental agencies or other persons without threat of discharge or reprisal in any form or manner whatsoever.
>
> j. Have the right to a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to expect and receive appropriate assessment, management

     and treatment of pain as an integral component of that person's care and consistent with sound nursing and medical practices.

   k. Have the right to refuse to perform services for the nursing home that are not included for therapeutic purposes in his plan of care as recorded in his medical record by his physician.

   l. Have the right to reasonable opportunity for interaction with members of the opposite sex. If married, the resident shall enjoy reasonable privacy in visits by his spouse and, if both are residents of the nursing home, they shall be afforded the opportunity, where feasible, to share a room, unless medically inadvisable.

   m. Not be deprived of any constitutional, civil or legal right solely by reason of admission to a nursing home.

   n. Have the right to receive, upon request, food that meets the resident's religious dietary requirements, provided that the request is made prior to or upon admission to the nursing home.

N.J.S.A. 30:13-5.

  Plaintiffs' complaint does not reference any of the specific rights listed in N.J.S.A. 30:13-5, such as "the right to manage his own financial affairs," "right to wear his own clothing," or the "right to retain or use his personal property". (N.J.S.A. 30:13-5(a)-(c)). Instead, plaintiffs reference only N.J.S.A. 30:13-5(j)'s more generalized right to a "safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident" to try and argue around this being a professional medical negligence case. (ECF 15, ¶ 22b).

  Plaintiffs cannot succeed then in recasting their medical negligence claim as an NHA "rights" claim. See Ptaszynski, 440 N.J. Super. 24, 39-40 (App. Div. 2015) (cert. denied, 227 N.J. 357 (2016). Ptaszyinksi, makes clear that medical negligence and violations of N.J.S.A. 30:13 et seq. are distinguishable causes of action. The Act, and specifically N.J.S.A. 30:13-5, is not intended to be utilized as a "sword" for any patient who allegedly received medical treatment which may deviate from an accepted standard of care. Yet, this is precisely the approach plaintiffs are pursuing here. Plaintiffs seek to recast a personal injury action arising out of COVID response efforts to avoid

statutory immunities and the higher burden of proof along with additional substantive defenses afforded to defendants against such claims. Such gamesmanship is improper and respectfully should not be permitted by the Court.

## II. PLAINTIFFS' CLAIMS ARE BARRED BY THE PREP ACT.

Plaintiffs' opposition papers also seek improperly to obfuscate the central allegation of the complaint – which arises out of negligence in the operation of a licensed long-term care facility resulting in COVID-19 infection and physical injury -- by referring to alleged resident rights violations so as to avoid application of the PREP Act. But these efforts are disingenuous and fail. If their allegations are truly limited to alleged bruises to an eye (Opposition, p. 10) and removal a uteral stent in 2018 (Opposition, p. 11) predating COVID-19 and the related Declaration under the PREP Act, plaintiffs would limit the complaint to those pre-COVID claims, and defendants' immunity arguments would not be applicable. However, plaintiffs cannot do so here lest their entire complaint collapses given that this action arises solely from COVID-19 infections and physical injury including death.

Instead, the PREP Act is triggered by the claim here. Plaintiffs concede that their "COVID-related claims [are] that they were harmed because defendants failed to take certain steps such as, separating residents, enforcing social distancing, …ensuring adequate staff levels, enforcing mask wearing…" (Opposition, p. 11). Their allegations regarding mask wearing and failure to utilize masks in March and April 2020 clearly implicate the PREP Act. Masks and other PPE are recognized covered countermeasures which explicitly invoke PREP Act protections. The purposeful allocation and use of these covered countermeasures by the defendants, who are recognized covered persons, confers immunity under the PREP Act.

Plaintiffs' reliance on Maglioli v Andover Subacute Rehab Ctr. I, 478 F. Supp. 3d 518 (D.N.J. Aug 12, 2020), is also misplaced. First, the central issue in that matter was whether the Court

had federal jurisdiction based on the Federal Officer Removal statute and the PREP Act by virtue of complete preemption. That decision arose from the plaintiffs' motion to remand the action to the state court.[1] As the issue before the Maglioli Court was solely whether the federal court had jurisdiction to hear plaintiffs' state law cause of action, the immunity issue was not and could not be reached by the Court, as acknowledged when the court stated that it was in no way deciding whether "[d]efendants are, or are not, entitled to a PREP Act defense." Moreover, those jurisdictional issues are currently on appeal in the United States Court of Appeals for the Third Circuit. (Case No. 20-2833). Since the decision in Maglioli, some 10 months ago, other Courts have found that the PREP Act is a complete preemption statute and the immunity may apply depending on the facts of the case. See Garcia v. Welltower OpCo Group, 2021 U.S. Dist. LEXIS 257838 (C.D. Cal. Feb 10, 2021); Rachal v. Natchitoches Nursing & Rehabilitation Center, LLC, No. 1:21-cv-0034-DCJ-JPM (W. D. La. Apr. 30, 20201). The holding in Dupervil is similarly inapplicable and unpersuasive, and as subsequent law has made clear, was wrongly decided. (See Rachel). Nonetheless here, unlike Dupervil, plaintiffs' cause of action arises directly from allegations that Defendants negligently administered, allocated, and distributed PPE causing plaintiffs' injuries.

Accordingly, as plaintiffs' claims arise out of use and allocation of covered countermeasures, including PPE such as masks, resulting in COVID-19 infection and physical injury, the PREP Act is triggered, and plaintiffs' claims must be barred.

## III. THE PREP ACT IS A COMPLETE PREEMPTION STATUTE.

Plaintiffs' opposition also rejects defendants' interpretation of the PREP Act and failure to cite to more case law holding that the PREP Act is a complete preemption statute. However, their argument ignores that the application of the COVID-19 PREP Act directive and the legal issues

[1] Notably, an appeal of that decision is presently before the Third Circuit with oral argument set for June 23, 2021; in addition, that case was successively removed based on new legal authority and it is again pending before this Court.

arising out of the response to the COVID-19 pandemic are as new as the pandemic that started in March 2020; as such, any resulting legislation or caselaw could only develop as cases arose and worked themselves slowly through a court system which was itself hampered by the pandemic. Plaintiffs' heavy reliance on Maglioli, a decision which has been criticized by the Department of Health and Human Service, the Department of Justice, subsequent case law, and which is pending on appeal in 5 federal circuits (3rd, 5th, 9th, 2nd , and DC Circuits), demonstrates this point. Since that limited decision was issued, the PREP Act has been recognized as a complete preemption statute in multiple instances by the federal government and by at least two federal courts. The Court in Rachel explained:

> District courts across the country have examined whether the PREP Act is a complete preemption statute and have arrived at varying conclusions. See e.g., Dupervil v. Alliance Health Operations, LCC, 2021 WL 355137 (E.D.N.Y. Feb. 2, 2021); Garcia v. Welltower OpCo Group LLC, 2021 WL 492581 (C.D. Cal. Feb. 10, 2021). For the reasons that follow, the Court finds that the PREP Act is a complete preemption statute, thus creating a federal cause of action as specified therein.
>
> To establish complete preemption for purposes of federal question jurisdiction, Fifth Circuit jurisprudence requires that a defendant must show: (1) the statute contains a civil enforcement provision that creates a cause of action that both replaces and protects the analogous area of state law; (2) there is a specific jurisdictional grant to the federal courts for enforcement of the right; and (3) there is a clear Congressional intent that claims brought under the federal law be exclusive. PCI Transp., Inc. v. Fort Worth & W. R.R. Co., 418 F.3d 535, 544 (5th Cir. 2005). The PREP Act contains each of these elements as to claims falling within its scope. To illustrate this point, it is instructive to compare the principal components of the PREP Act and the Air Transportation Safety and System Stabilization Act of 2001 ("ATSSSA") passed in the wake of the September 11, 2001, terrorist attacks, which the Second Circuit held was a complete preemption statute. Pub.L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101); In re WTC Disaster Site, 414 F.3d 352 (2d Cir. 2005). Instrumental to the Second Circuit's analysis was the ATSSSA's statutory components, which consist of: (i) the creation of a Victim Compensation Fund to provide relief, without litigation, to individuals (or relatives of deceased individuals) physically injured or killed as a result of the September 11 attacks; (ii) immunity to the airlines; (iii) a federal cause of action as the exclusive judicial remedy for damages arising out of the attacks; and (iv) an exclusive venue in the United States District Court for the Southern District of New York for all suits brought on that

> federal cause of action. In re WTC Disaster Site, 414 F.3d at 373. Significantly, the composition of the PREP Act is very similar in that it: (i) creates a Covered Countermeasure Process Fund to provide relief, without litigation, to eligible individuals for "covered injuries" directly caused by the administration or use of a "covered countermeasure;" (ii) provides immunity to "covered persons," except in the case of "willful misconduct;" (iii) creates an exclusive federal cause of action for damages against a covered person for willful misconduct; and (iv) provides that the federal court in the District of Columbia is the exclusive federal venue for suits on the federal cause of action. 42 U.S.C. § 247d-6(d); 42 U.S.C. § 247d-6(e).
>
> Further, the PREP Act states that the remedy available in the Covered Countermeasure Process Fund "shall be exclusive of any other civil action or proceeding for any claim or suit this section encompasses," with the exception of the federal cause of action for damages against a "covered person" for willful misconduct. Id. § 247d-6(d). The Court concludes that, together, these provisions demonstrate Congress's intent that the PREP Act exclusively encompass "claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." Id. § 247d-6d(a)(1). Accordingly, to the extent Plaintiff's alleged loss was caused by a "covered person" and arose out of, related to, or resulted from the administration to or the use by an individual of a "covered countermeasure," this Court has federal question jurisdiction to apply the provisions of the PREP Act.

Rachel, supra, at *3.

Based on this holding as well as the other legal authority cited in defendants' moving brief, it is clear that non-binding case law relied upon by plaintiffs is not dispositive of this issue and that the PREP ACT is indeed a complete preemption statute which bars plaintiffs' claims.

## IV. BECAUSE PLAINTIFFS' CLAIMS TRIGGER THE PREP ACT, PLAINTIFFS WERE OBLIGATED, AND FAILED, TO EXHAUST THEIR ADMINISTRATIVE REMEDIES THEREBY DEPRIVING THIS COURT OF JURISDICTION.

Notably, the one forum in which plaintiffs should have filed a claim is the one in which they have not brought their claims. Plaintiffs initially filed a complaint in New Jersey Superior Court and withdrew it. They subsequently filed this action and thereafter amended their complaint when faced with a motion to dismiss. These multiple pleadings were designed to avoid evolving immunities developed in response to the COVID-19 crisis and to trigger the potential award of attorneys' fees through fee shifting statutes. However, plaintiffs cannot escape the fact that this case at its core

involves the use and allocation of PPE surrounding the COVID-19 pandemic and their resultant injury triggering the PREP Act and the designated administrative remedy with the CCPF.

In codifying HHS's authority to coordinate the national response to a public health emergency, Congress set out an extensive, streamlined no-fault federal administrative claims process to ensure remedy and fairness for claimants and respondents by

a) Setting up a no-fault monetary fund (CCPF) to compensate eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure. See 42 U.S.C. §247d-6e(a);

b) Directing that access to the monetary fund must be **exhausted** before being allowed to proceed to the alternative federal civil claims process of §247d-6d. See §247d-6e(d)(1);

c) Requiring an exclusive federal remedy: "The remedy provided by [the monetary fund] shall be **exclusive** of any other civil action or proceeding for any claim or suit this section encompasses, except for a proceeding [for willful misconduct] under section 247d–6d of this title." See §247d-6e(d)(4) (emphasis added);

d) Mandating that the only recovery for claims under the PREP Act shall be through the monetary fund or through the PREP Act claims process: "the individual has an **election** to accept the compensation [under the monetary fund] or to bring an action under section 247d–6d(d) of this title." See §247d-6e(d)(5) (emphasis added).

Before a claimant may file a lawsuit (and, then, only one claiming willful misconduct), they must first exhaust their pre-litigation administrative remedies through the federal emergency no-fault fund designated by the PREP Act. See §247d-6e. Only after a claimant exhausts those administrative remedies will they be allowed to bring a litigation claim, and then, only for willful misconduct brought in the United States District Court for the District of Columbia (D.D.C.). See §§247d-6d(c)(4), (e)(1), (5) (the D.D.C is designated as the exclusive jurisdiction for PREP litigation claims). The CCPF process is the exclusive prerequisite vehicle for recovery where a COVID-19 countermeasure negligence or willful misconduct claim is pled.

The complaint specifically faults Andover II for failing to ensure that "staff properly used personal protective equipment (PPE) when caring for COVID-19 positive or COVID-19 suspected

residents" as well as an improper use of infrared thermometers and the negligent administration of their infection control programs, which include numerous countermeasures such as PPE and testing and safety equipment designed to combat the transmission of COVID-19. (ECF 15, ¶36). Similar failures as to improper use of COVID-19 countermeasures are alleged as against Andover I. Id. The complaint further alleges that this "substandard level of care" to plaintiffs or their decedents "caused them to suffer serious bodily harm." Id. ¶18. Plaintiffs specifically complain that, as a result of these failures: Plaintiff Emerson contracted COVID-19 in March 2020 (id. ¶19d); Plaintiff Desbiens contracted COVID-19 in March 2020 and died as a result on May 11, 2020 (id. ¶20l-m); and Plaintiff Roberts contracted COVID-19 in March 2020 and died as a result on April 1, 2020. Id. ¶21d-e. The only forum to address these claims is the CCPF.

Plaintiffs' failure to exhaust their pre-litigation administrative remedies deprives this Court of subject matter jurisdiction. See, e.g., Adams v. U.S. Capitol Police Bd., 564 F.Supp. 2d 37, 40 (D.D.C. 2008) (failure to exhaust administrative remedies goes to subject matter jurisdiction, and plaintiff has the burden of persuasion); Wright & Miller, 5B Fed. Prac. & Proc. §1350, Note 5 (3d ed.) (collecting cases). Moreover, where an administrative remedy is required by statute, there is no room for judicial discretion if a claimant fails to satisfy the statutorily proscribed exhaustion protocols. Ross v. Blake, 136 S.Ct. 1850, 1857 (2016). As such, the Court has no discretion and must dismiss the present matter based on failure to exhaust the pre-litigation administrative remedy created in the PREP Act.

## V. THE NEW JERSEY COVID IMMUNITY STATUTE BARS PLAINTIFFS' CLAIMS.

Plaintiffs mischaracterize the allegations of the complaint in an effort to avoid the New Jersey immunity statute as well. They argue that "Plaintiffs' claims are not implicated or prohibited by the NJ COVID Immunity Law." (Opposition, p. 16). However, the claims most certainly arise out of an alleged failure to ensure that "staff properly used personal protective equipment (PPE)

when caring for COVID-19 positive or COVID-19 suspected residents" as well as an improper use of infrared thermometers and the negligent administration of their infection control programs, which include numerous countermeasures such as PPE and testing and safety equipment designed to combat the transmission of COVID-19.  Id. ¶36. Plaintiffs specifically complain that, as a result of these failures:  Plaintiff Emerson contracted COVID-19 in March 2020 (id. ¶19d); Plaintiff Desbiens contracted COVID-19 in March 2020 and died as a result on May 11, 2020 (id. ¶20l-m); and Plaintiff Roberts contracted COVID-19 in March 2020 and died as a result on April 1, 2020. Id. ¶21d-e.

Plaintiffs' argument that these allegations are not COVID-19 related but somehow refer to routine medical care exempted by the prefatory language to the statute included due to the lack of any legislative hearings is nonsensical. Also, it is notable that the absence of legislative hearings was due to COVID-19 isolation protocols. The specific language carving out routine medical care states:

> For example, procedures performed by licensed medical professionals in their ordinary course of business, including orthopedic procedures, OB/GYN services, and necessary cardiological procedures. It is not the Legislature's intent to grant immunity for medical services, treatment and procedures that are unrelated to the COVID 19 emergency.

S-2333/A-3910, ¶ 24-27.  And this limited exception for routine medical care is not triggered by the allegations of the complaint. However, the sweeping immunity set forth in the statute is indeed triggered.  Medical professionals along with the facilities and health systems that they work for "shall not be liable for civil damages for injury or death alleged to have been sustained as a result of an act or omission . . . in the course of providing medical services in support of the State's response to the outbreak of coronavirus disease[.]" The sweeping immunity also extends to "any act or omission undertaken in good faith by a healthcare professional or healthcare facility or a health care system to support efforts to treat COVID-19 patients and to prevent the spread of COVID-19."

The allegations of the complaint arise out of alleged failures with regard to the actions undertaken in good faith by defendants to treat COVID-19 infected residents and to prevent the transmission and spread of COVID-19. The allegations of the complaint thus trigger this immunity. Moreover, defendants were required by a March 31, 2020 directive from the N.J. DOH to accept readmission of a resident based on confirmed COVID-19 diagnosis. The facilities were also prohibited from requiring a negative COVID-19 test as a precondition to readmission or admission.[2] This converted each defendant into a "health care facility …support[ing] efforts to treat COVID-19 patients and to prevent the spread of COVID-19." This is the very conduct immunized by the statute, triggering the NJ COVID Immunity and barring plaintiffs' complaint.

Finally, plaintiffs do not argue in opposition to defendants' point that "injury" as used in the statute includes any statutory right or remedy that may have been impacted by defendants' COVID response efforts. As such, this point is conceded, and plaintiffs' NHA claims and consumer fraud claims are barred by the statute, eliminating every possible recovery for any injury.

## VI. THE NJ CONSUMER FRAUD ACT DOES NOT APPLY TO DEFENDANTS BASED ON THE LEARNED PROFESSIONAL EXCEPTION.

Plaintiffs' opposition presents a hornbook recitation of the general purpose of New Jersey Consumer Fraud Act. However, plaintiffs fail to address the case law cited by defendants which specifically demonstrates the applicability of the Learned Professional Exception to defendants. The learned professional exception specifically shields healthcare facilities and entities from CFA claims. In Hampton Hosp. v. Bresan, 288 N.J. Super. 372 (App. Div. 1996), the Appellate Division found that there was no purpose to require hospitals to be within the purview of the CFA when the same services fall within the purview of the Department of Health. The goal of the CFA, namely, to protect consumers, is already being accomplished by the Department. The Department of Health

---

[2] *https://nj.gov/health/legal/covid19/3-31-2020%20Hospital%20Discharges%20and%20Admissions%20to%20Post-Acute%20Care%20Settings.pdf*

also regulates and oversees the defendants' operation of a licensed long-term care facility similar to hospitals. Defendants similarly employ or utilize the services of professionals recognized to be exempt from the CFA such as physicians. Similarly, Atlantic Ambulance Corp. v. Cullum, 451 N.J. Super. 247 (App. Div. 2017), the Appellate Division held that ambulance service providers are not subject to consumer fraud claims because under the learned professional exception ambulance services are comprehensively regulated by a state agency. In reaching its conclusion, the Cullum court reviewed the relevant statutory and regulatory provisions concerning ambulance services. It found that, by statute, the Department of Health is charged with overseeing the provision of health care services to the public, which specifically include ambulance services, the Department's regulations establish stringent licensure requirements for ambulance services, and the Department has the right to take enforcement action against them. Plaintiffs make no effort to distinguish or address either of these cases which require dismissal of the CFA claims based on the Learned Professional exception.

The Learned Professional exception has already been applied to nursing homes, shielding them from CFA claims. See Manahawkin Convalescent v. O'Neill, 426 N.J. Super. 143 (App. Div. 2012) aff'd, 217 N.J. 99(2014). Like hospitals, nursing home facilities are strictly regulated, particularly those accepting patients who receive federally funded medical assistance through Medicaid and Medicare. Id. at 155. Pursuant to these regulations, the New Jersey Department of Health is authorized to maintain an action in the name of the State to enforce the provisions of the New Jersey Nursing Home Act and any regulations promulgated pursuant to N.J.S.A. 30:13-8(a). The Appellate Division in O'Neill found that applying the CFA to a nursing facility that is subject to state regulation would "create an impermissible circumstance where divergent determinations and penalties for the same subject matter may occur. Id. (citing Daaleman v. Elizabethtown Gas Co.,

77 N.J. 267, 272(1978)). As such, the Appellate Division has already determined that nursing homes are shielded from CFA claims under the Learned Professional exception.

Finally, plaintiffs' argument that "Defendants' have engaged in unconscionable consumer practices by intentionally suppressing the reporting of residents' deaths and the concealment of bodies," is categorically untrue. But even if accepted as true, these allegations would be investigated by the NJ Department of Health and CMS at both the state and federal regulatory levels. Allowing plaintiffs' CFA complaint to proceed creates exactly the type of conflict and potential for inconsistent requirements that the Learned Professional exception was created to guard against. Thus, plaintiffs' own allegations, as fanciful as they are, demonstrate the need and justification for the application of the Learned Professional exception and dismissal of the CFA claims.

## CONCLUSION

For the reasons set forth in defendants' moving papers and above, defendants' respectfully request that plaintiffs' complaint be dismissed in its entirety.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s Malinda A. Miller*

Malinda A. Miller, Esq.
*Attorneys for Defendants*
One Riverfront Plaza, Suite 800
Newark, New Jersey 07102
973.577.6260
973.577.6261 (fax)
Malinda.Miller@lewisbrisbois.com

Date: June 7, 2021