UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL EMERSON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ANDOVER SUBACUTE REHABILITATION CENTER I, *et al.*, <br><br> Defendants. | Civil Action No. 20-cv-20066 (JXN)(AME) <br><br> **OPINION** |

**NEALS**, District Judge

Before the Court is Defendants'[1] motion to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure[2] 12(b)(6) and 12(b)(1). (ECF No. 59.) Plaintiffs[3] opposed (ECF No. 75) and Defendants replied (ECF No. 77). Also before the Court is Defendants' unopposed motion to dismiss the Second Amended Complaint as to Emerson. (ECF No. 79.) The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' unopposed motion to dismiss Emerson is **GRANTED**. Defendants' motion to dismiss the Second Amended Complaint is **GRANTED in part**.

---

[1] "Defendants" collectively refer to Andover Subacute Rehabilitation Center I ("Andover I"), Andover Subacute Rehabilitation Center II ("Andover II"), Altitude Investments, Ltd. ("Altitude"), Alliance Healthcare ("Alliance"), and Healthcare Services Group ("HSG").

[2] "Rule" or "Rules" hereinafter refers to the Federal Rules of Civil Procedure.

[3] "Plaintiffs" collectively refer to Michael Emerson ("Emerson"), the Estate of Albert C. Roberts ("Roberts Estate"), and the Estate of Michele Desbiens ("Desbiens Estate").

I.      **BACKGROUND**

    A.      **Statement of Facts**

Emerson, Albert C. Roberts ("Roberts"), and Michele Desbiens ("Desbiens") were residents at two New Jersey nursing homes, Andover I and II. (Second Am. Compl. ("SAC") ¶¶ 1-3, ECF No. 55.) Plaintiffs allege Emerson "sustained multiple bruises and a black eye while in the sole custody of an Andover II staff member" in March 2020. (*Id.* ¶ 19(b).) Later that month, he "contracted COVID-19." (*Id.* ¶ 19(c).) Plaintiffs allege Desbiens developed visible signs of skin cancer in early 2018. (*Id.* ¶ 22(b).) Despite her family's urging, Plaintiffs claim Andover II refused to treat the cancer. (*Id.* ¶ 22(c)-(d).) In late 2018, Desbiens had a uteral stent implanted in her body. (*Id.* ¶ 22(f).) The surgeon instructed Desbiens to have it removed in six months. (*Id.* ¶ 22(g).) But, according to Plaintiffs, Andover II refused to "take any action to have the uteral stent removed." (*Id.* ¶ 22(f)-(i).) In May 2020, Desbiens contracted COVID-19 and died later that month. (*Id.* ¶ 22(k)-(l).) When Desbiens died, her skin cancer was left untreated, and the uteral stent remained in her body. (*Id.* ¶ 22(l).) Roberts, meanwhile, contracted COVID-19 in March 2020 and died in April 2020. (*Id.* ¶ 25(b)-(c).) Plaintiffs claim Andover II did not inform Roberts's family of his death for several weeks. (*Id.* ¶ 25(d).)

Plaintiffs assert Emerson, Desbiens, and Roberts contracted COVID-19 because "Defendants failed to employ any available measures, strategies or tactics to stop the spread of COVID-19." (*Id.* ¶¶ 19(c), 22(k), 25(b).) And they allege the harm Plaintiffs suffered was "a direct result of Defendants' failure to comply with the applicable federal and state nursing home regulations." (*Id.* ¶ 26.) Plaintiffs claim that inspections of Andover I and II between 2015 and 2020 revealed a pattern of non-compliance with state and federal nursing home regulations. (*Id.* ¶¶ 28-34.) Plaintiffs aver the Centers for Medicare and Medicaid Services ("CMS") issued an

inspection report in April 2020, finding that Andover II was "not following infection control safety practices and guidance recommended by CMS and the Centers for Disease Control and Prevention ("CDC"), during [the] COVID-19 pandemic." (*Id.* ¶ 35.) This report found Andover II failed to ensure: "appropriate transmission based precautions," infection surveillance and tracking, proper personal protective equipment ("PPE") use, proper staff training, or appropriate precautionary signs. (*Id.* ¶ 36.)

### B. Procedural History

In December 2020, Plaintiffs filed a class action lawsuit in this Court on behalf of "[a]ll persons who, were residents and/or patients of [Andover I or II], during the applicable statute of limitations period."[4] (*See* Compl. ¶ 43, ECF No. 1.) The complaint asserted causes of action under 42 U.S.C. § 1983; the New Jersey Nursing Home Act ("NHA"), N.J.S.A. 30:13-1 to -13; and the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-2. (*Id.* ¶¶ 51-75.) Defendants moved to dismiss, arguing federal and state law granted Defendants immunity for their responses to the COVID-19 pandemic, the complaint failed to state an actionable NHA violation, the CFA did not apply to Defendants, and any allegations before December 2018 were time-barred. (First Mot. Dismiss 13-31,[5] ECF No. 12-1.)

Plaintiffs amended the complaint. (*See* First Am. Compl., ECF No. 15.) Defendants moved to dismiss on the same grounds. (Second Mot. Dismiss, ECF No. 33). The Court granted the motion to dismiss after oral argument. (*See* Order, ECF No. 49.) On the § 1983 claim, the Court found Plaintiffs failed to sufficiently plead "the color of state law requirement." (*See* Tr. 34:2-4, ECF No. 50.) "[T]hat the facilit[ies] received Medicare funding is not in and of itself enough to satisfy

---

[4] Three months earlier, the Roberts Estate filed a similar class action lawsuit in New Jersey Superior Court, (*see* Mot. to Dismiss Ex. A., ECF No. 59-5), but apparently dismissed it prior to filing this lawsuit, (*see* Defs.' Moving Br. 10, ECF No. 59-1).
[5] The Court refers to ECF page numbers.

3

color of state law." (*Id.* at 34:4-6.) The Court found Plaintiffs' NHA claims were "somewhat . . . conclusory." (*Id.* at 34:18-19.) The amended complaint alleged each Plaintiff was "a resident and this is what they suffered. It doesn't say how they suffered it." (*Id.* at 34:23-25.) The Court found the CFA claim failed to include enough specific allegations to surmount the "learned professionals" exception. (*Id.* at 35:7-16.) Accordingly, the Court dismissed the amended complaint without prejudice. (*See* Order.)

Plaintiffs amended the complaint a second time.[6] (*See* SAC). The Second Amended Complaint includes causes of action for negligence *per se*, the NHA, and the CFA. (*Id.* ¶¶ 55-90.) For the negligence *per se* claim, Plaintiffs assert that Defendants violated state and federal nursing home laws, which proximately caused Plaintiffs to sustain medical injuries while living at Andover I and II. (*Id.* ¶¶ 55-71.) Plaintiffs allege Defendants violated the NHA by admitting too many residents, violating state and federal law, failing to provide a "safe and decent living environment and considerate and respectful care," and violating Plaintiffs' constitutional rights. (*Id.* ¶¶ 72-77.) Plaintiffs assert Defendants violated the CFA because they lied about the quality of care Andover I and II provided. (*Id.* ¶¶ 78-90.)

Defendants move to dismiss under Rules 12(b)(6) and 12(b)(1). (*See* Third Mot. Dismiss, ECF No. 59.) They argue the Second Amended Complaint is just as conclusory as before; Plaintiffs still fail to include facts to surmount the "learned professionals" exception to the CFA; Plaintiffs cannot allege negligence *per se* because they do not have a private cause of action for the state and federal regulations they cite; and federal law grants Defendants immunity for their response to the

---

[6] The Court notes it has subject matter jurisdiction over this action. District courts have jurisdiction "to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (quoting 28 U.S.C. § 1332(d)(2), (d)(5)(B)). Here, Plaintiffs explicitly allege the class has more than 100 members, at least one plaintiff is diverse from at least one defendant, and the amount in controversy exceeds $5,000,000. (SAC ¶ 15.)

COVID-19 pandemic. (*See* Defs.' Moving Br. 15-34, ECF No. 59-1.) Plaintiffs opposed (Pls.' Opp'n Br., ECF No. 75) and Defendants replied (Defs.' Reply Br., ECF No. 77).

Shortly after Defendants moved to dismiss the Second Amended Complaint, Emerson died. (*See* Notice of Passing, ECF No. 62.) The Court granted Plaintiffs ninety days to substitute Emerson with a representative of his estate. (*See* Order Granting Stay, ECF No. 64.) Later, however, Plaintiffs informed the Court "a representative will not be appointed for the Estate of Michael Emerson." (Apr. 15, 2025 Letter, ECF No. 69.) Defendants then moved to dismiss the Second Amended Complaint as to Emerson, arguing no party has standing to continue the action on Emerson's behalf. (Mot. to Dismiss Emerson, ECF No. 79-1.)

## II. <u>LEGAL STANDARD</u>

### A. Rule 12(b)(6)

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

The Court conducts a three-step inquiry in evaluating a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the Court identifies "the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the Court accepts all plaintiff's well-pleaded factual allegations as true and "construe[s] the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). But the Court

disregards "legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). Third, the Court considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

      **B.**      **Rule 12(b)(1)**

A complaint may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A party can move to dismiss for lack of subject matter jurisdiction at any time." *Bosco v. Compass Grp. USA, Inc.*, No. 22-6909, 2025 WL 1742657, at *2 (D.N.J. June 23, 2025). "Challenges to subject matter jurisdiction under Rule 12(b)(1) may be facial or factual." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (quoting *Common Cause of Pa. v. Pennsylvania,* 558 F.3d 249, 257 (3d Cir. 2009)). A facial attack "considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). In evaluating a facial attack, the Court construes the facts alleged in the complaint in a light most favorable to the non-moving party. *Id.* A factual attack asserts "there is no subject matter jurisdiction because the facts of the case . . . do not support the asserted jurisdiction." *Id.* In a factual attack, the Court may look beyond the facts alleged in the pleading. *Id.* "A district court may grant a motion to dismiss for lack of subject matter jurisdiction based on the plaintiff's failure to exhaust a required administrative remedy only if it is undisputed that there has been no attempt to exhaust the administrative remedy." *Moyer v. Showboat Casino Hotel, Atl. City*, 56 F. Supp. 2d 498, 499 (D.N.J. 1999).

**III.**      **DISCUSSION**

      **A.**      **Motion to Dismiss Emerson**

6

Rule 25 governs the substitution of parties. "If a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). However, "[i]f the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(3). Emerson's counsel noted the death on November 12, 2024 (Notice of Passing), sought a substitution, and later "confirmed that a representative will not be appointed for the Estate of Michael Emerson" (Apr. 15, 2025 Letter). More than ninety days have passed since then. No representative of Emerson's estate has moved to substitute. The Court, therefore, dismisses Emerson from the action with prejudice.

### B. Motion to Dismiss the Second Amended Complaint

As discussed above, the Second Amended Complaint alleges negligence *per se* and violations of the NHA and CFA. The Court considers each claim in turn.

#### i. Negligence Per Se

To establish negligence under New Jersey law, the plaintiff must show "(1) a duty of care owed to the plaintiff by the defendant; (2) that defendant breached that duty of care; and (3) that plaintiff's injury was proximately caused by defendant's breach." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014). And, in New Jersey, a statutory violation "might support a claim in any one of three ways: the statute may create civil liability by its provisions, a violation may constitute negligence *per se*, or a violation may constitute evidence of negligence." *K.J. v. J.P.D.*, 659 F. Supp. 3d 471, 479 (D.N.J. 2023) (quoting *Gonzalez v. N.J. Dep't of Child & Fams.*, 545 F. Supp. 3d 178, 232 (D.N.J. 2021)).

"Negligence *per se* is not often invoked in New Jersey generally because its application is so narrow." *Labega v. Joshi*, 270 A.3d 378, 388 (N.J. Super. App. Div. 2022). The doctrine applies

7

when a statute "'specifically incorporate[s] the non-statutory or common-law standard' of negligence." *K.J.*, 659 F. Supp. 3d at 479 (quoting *Gonzalez*, 545 F. Supp. 3d at 232). "Said differently, where a statute requires a finding that the defendant failed to exercise reasonable care, that finding, by its terms, 'constitutes a finding of negligence.'" *Boria v. Heritage at Alexander Hamilton*, No. 23-22914, 2024 WL 3585579, at *2 (D.N.J. July 30, 2024) (quoting *Senisch v. Tractor Supply Co.*, No. 16-47, 2018 WL 324717 at *11 (D.N.J. Jan. 8, 2018)). Thus, in the case of negligence *per se*, proof that the defendant violated a statute or regulation "is proof of negligence itself." *Labega*, 270 A.3d at 389 (quoting *Eaton v. Eaton*, 575 A.2d 858, 866 (N.J. 1990)). However, because "statutes 'rarely define a standard of conduct in the language of common-law negligence,' the application of negligence *per se* is 'the exceptional situation.'" *Boria*, 2024 WL 3585579, at *4 (quoting *Labega*, 270 A.3d at 389).

Plaintiffs base their negligence *per se* claim on violations of federal nursing home regulations, 42 C.F.R. §§ 483.1 to .95. (SAC ¶¶ 59-68.) But none of the regulations Plaintiffs cite specifically incorporate the common law standard of care. *See* 42 C.F.R. §§ 483.10 (resident rights), .12 (freedom from abuse, neglect, and exploitation), .20 (resident assessment), .21 (comprehensive person-centered care planning), .25 (quality of care), .35 (nursing services), .45 (pharmacy services), .60 (food and nutrition services), .73 (emergency preparedness), .80 (infection control). "Specifically, the regulations do not prohibit an individual from acting negligently or below the standard of reasonable care, such that a violation would be 'proof of negligence itself.'" *Boria*, 2024 WL 3585579, at *4 (quoting *Labega*, 270 A.3d at 389). Moreover, neither the NHA nor its implementing regulations adopt the common law standard of care. *See, e.g.,* N.J.S.A. 30:13-3 (nursing home responsibilities); N.J.S.A. 30:13-5 (nursing home resident rights); N.J.A.C. 8:39-27.1 (mandatory policies for quality of care).

8

Because the regulations Defendants allegedly violated do not incorporate the common law standard of care, Plaintiffs fail to state a claim for negligence *per se* upon which relief can be granted. The Court therefore dismisses Plaintiffs' negligence *per se* claim with prejudice.[7]

    ii.    *Nursing Home Act*

New Jersey enacted the NHA "to declare 'a bill of rights' for nursing home residents and define the 'responsibilities' of nursing homes." *Ptaszynski v. Atl. Health Sys., Inc.*, 111 A.3d 111, 116 (N.J. Super. App. Div. 2015). N.J.S.A. 30:13-3 sets forth a nursing home's responsibilities. N.J.S.A. 30:13-5 establishes a bill of fourteen rights for nursing home residents. The Department of Health adopted regulations, N.J.A.C. 8:39-1.1–47.5, to implement the NHA.

The NHA does not "authorize a person to bring an action to enforce the nursing home's 'responsibilities' as defined in the law." *Ptaszynski*, 111 A.3d at 116. A nursing home's failure to comply with Department of Health regulations "constitute[s] a deficiency for which the Department [of Health] may take . . . enforcement actions." N.J.A.C. 8:39-3.1. But "[a]ny person or resident whose rights as defined [in N.J.S.A. 30:13-5] are violated shall have a cause of action against any person committing such violation." N.J.S.A. 30:13-8.

    a.    **Responsibilities**

Plaintiffs allege Defendants violated their responsibilities under the NHA by admitting too many residents, in violation of N.J.S.A. 30:13-3(c), and failing to comply with state and federal laws and regulations, in violation of N.J.S.A. 30:13-3(h). Plaintiffs, however, cannot recover under

---

[7] "[I]f a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236 (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir.2002)). An amendment is futile if it "advances a claim that is legally insufficient on its face." *Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co.*, 106 F. Supp. 2d 761, 764 (D.N.J. 2000). Because neither state nor federal nursing home laws incorporate the common law negligence standard, a negligence *per se* claim is legally insufficient on its face.

9

the NHA for breaches of a nursing home's responsibilities. *Ptaszynski*, 111 A.3d at 116. Relief cannot be granted on that basis.

### b. Regulations

Plaintiffs allege Defendants violated the patient rights set forth in N.J.A.C. 8:39-4.1(a). But only the New Jersey Department of Health may enforce N.J.A.C. 8:39-4.1(a). *See Watson v. Sunrise Sr. Living Facility, Inc.*, No. 10-230, 2015 WL 4459362, at *12 (D.N.J. July 17, 2015) ("Again, there is no provision for a private right of action, and the enforcement provision appears to rule out such a right of action."). Accordingly, N.J.A.C. 8:39-4.1(a) does not supply a viable cause of action under the NHA.

### c. Rights

Plaintiffs allege Defendants violated their rights to "a safe and decent living environment and considerate and respectful care that recognizes the dignity and individuality of the resident, including the right to expect and receive appropriate assessment, management and treatment of pain as an integral component of that person's care consistent with sound nursing and medical practices." N.J.S.A. 30:13-5(j). Plaintiffs also claim Defendants violated their rights to "[n]ot be deprived of any constitutional, civil or legal right solely by reason of admission to a nursing home." N.J.S.A. 30:13-5(m).

The Second Amended Complaint does not plead any facts alleging Defendants deprived Plaintiffs of constitutional, civil, or legal rights "solely by reason of admission to a nursing home." *Id.* Plaintiffs identify no rights they were allegedly deprived of, nor how they were deprived of those rights "solely by admission" to Andover I and II. Accordingly, Plaintiffs fail to state a claim under N.J.S.A. 30:13-5(m) upon which relief can be granted.

But this does not end the inquiry. Taking Plaintiffs' well-pled allegations as true, they have adequately alleged Defendants violated their rights to "a safe and decent living environment" and "considerate and respectful care." N.J.S.A. 30:13-5(j). Plaintiffs claim Defendants "failed to employ any available measures, strategies or tactics to stop the spread of COVID-19." (SAC ¶¶ 22(k), 25(b).) If true, Defendants did not offer Plaintiffs "a safe and decent living environment." N.J.S.A. 30:13-5(j). Likewise, Plaintiffs allege Defendants refused to treat Desbiens' skin cancer or allow her uteral stent to be removed. (SAC ¶¶ 22(b)-(l).) Desbiens allegedly developed visible skin cancer in 2018. (*Id.* ¶ 22(b).) According to Plaintiffs, Defendants refused Desbiens's requests to treat it, and the cancer became so severe that treatment would require the amputation of her left arm. (*Id.* ¶¶ 22(b)-(e).) Similarly, Plaintiffs allege Desbiens had a uteral stent inserted in 2018, which her surgeon explained should be removed in six months. (*Id.* ¶¶ 22(f)-(g).) Plaintiffs claim Defendants refused to bring Desbiens to an outpatient facility to have the stent removed. (*Id.* ¶¶ 22(h)-(j).) When Desbiens died in 2020, she still had untreated skin cancer on her left arm and her uteral stent remained in her body. (*Id.* ¶ 22(l).) If true, Defendants failed to provide Desbiens with "considerate and respectful care." N.J.S.A. 30:13-5(j). Accordingly, Plaintiffs have plausibly alleged Defendants violated N.J.S.A. 30:13-5(j).

Defendants, meanwhile, argue they may not be held liable for their COVID-19 response under the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d, 247d-6e, and the New Jersey COVID-19 Immunity Statute, L. 2020, ch. 18. Setting aside the fact that Desbiens alleges injuries apart from contracting COVID-19, neither argument has merit.

### d. PREP Act Immunity

Congress passed the PREP Act in 2005. *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 400 (3d Cir. 2021); 42 U.S.C. §§ 247d-6d, 247d-6e. The Act "protects certain covered

11

individuals—such as pharmacies and drug manufacturers—from lawsuits during a public-health emergency." *Maglioli*, 16 F.4th at 400. The Act "lies dormant" until the Secretary of the Department of Health and Human Services ("HHS") invokes it. *Id.* "If the Secretary deems a health threat a public-health emergency, he may publish a declaration in the Federal Register recommending certain 'covered countermeasures.'" *Id.* (quoting 42 U.S.C. § 247d-6d(b)(1)). "When the Secretary makes such a declaration, the covered individuals become immune from suit and liability from claims related to the administration of a covered countermeasure." *Id.* at 400-01 (citing 42 U.S.C. § 247d-6d(a)(1)). "Covered persons include manufacturers, distributors, program planners, and qualified persons, as well as their officials, agents, and employees." *Id.* at 401 (quoting Declaration Under the PREP Act for Medical Countermeasures Against COVID-19 ("PREP Act Declaration"), 85 Fed. Reg. 15,198, 15,201 (Mar. 17, 2020)).

"The scope of immunity is broad." *Id.* PREP Act immunity encompasses all claims having "a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B).

"The Secretary controls the scope of immunity through the declaration and amendments, within the confines of the PREP Act." *Maglioli*, 16 F.4th at 401. Consistent with his authority, the Secretary issued a PREP Act declaration in March 2020, declaring COVID-19 a public-health emergency. *Id.* (citing PREP Act Declaration, 85 Fed. Reg. at 15,201). "The Secretary recommended a series of covered countermeasures that includes drugs, devices, and products 'used to treat, diagnose, cure, prevent, or mitigate COVID-19," subject to the PREP Act's definitions.'"

*Id.* (quoting PREP Act Declaration, 85 Fed. Reg. at 15,202). The Secretary has since amended the PREP Act Declaration several times. *Id.* And HHS has issued advisory opinions and guidance related to the Declaration. *Id.*

Defendants argue the PREP Act squarely forecloses Plaintiffs' claims. (Defs.' Moving Br. 27-42.) Defendants assert they are "covered persons," (*id.* at 31-32) who used "covered countermeasures," (*id.* at 32-33), and there is a causal nexus between their use, or non-use, of "covered countermeasures" and Plaintiffs' claims (*id.* at 34-42).

But Plaintiffs do not allege their injuries arose from "Defendants' administration to them of vaccines or medicines (or for that matter protective gear)." *Est. of Maglioli v. Andover Subacute Rehab. Ctr. I*, 478 F. Supp. 3d 518, 532 (D.N.J. 2020). Instead, Plaintiffs assert "Defendants committed negligence in that, among other things, they *failed* to take countermeasures, some of them allegedly federally required." *Id.* This distinction is critical. The PREP Act provides immunity from "all claims for loss caused by, arising out of, relating to, or resulting from *the administration to or the use by* an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(1) (emphasis added). The plain language of the Act does not confer immunity from claims involving a failure to administer or use a covered countermeasure. "[T]he PREP Act . . . [was] designed to protect those who employ countermeasures, not those who decline to employ them." *Est. of Maglioli*, 478 F. Supp. 3d. at 531. And "[c]ourts in this Circuit have resoundingly found that the PREP Act does not shield a covered individual from claims arising out of its *failure* to administer or use a covered countermeasure." *Testa v. Broomall Operating Co., L.P.*, 622 F. Supp. 3d 4, 10 (E.D. Pa. 2022). Indeed, the PREP Act "still leaves room for ordinary claims of negligent or substandard care." *Est. of Maglioli*, 478 F. Supp. 3d. at 532. Plaintiffs assert that, because Defendants failed to employ COVID-19 countermeasures, "the quality of the care they received

13

fell short of what a nursing home facility should have done to protect them from infection by the coronavirus. Such claims concerning the quality of care do not fall within the scope of the PREP Act." *Id.* Accordingly, the sweep of PREP Act immunity does not reach Plaintiffs' claims for negligent non-use of COVID-19 countermeasures.[8]

### e. New Jersey COVID-19 Immunity Statute

The New Jersey COVID-19 Immunity Statue provides healthcare professionals, facilities, and systems "shall not be liable for civil damages for injury or death alleged to have been sustained as a result of an act or omission by [a] health care professional in the course of providing medical services in support of the State's response to the [COVID-19 pandemic]." New Jersey COVID-19 Immunity Statute, L. 2020, ch. 18 § 1(c). This immunity encompasses "any act or omission undertaken in good faith by a health care professional or healthcare facility or a health care system to support efforts to treat COVID-19 patients and to prevent the spread of COVID-19 during the public health emergency." *Id.* But this immunity is not absolute. It "shall not apply to acts or omissions constituting a crime, actual fraud, actual malice, gross negligence, recklessness, or willful misconduct, and shall be retroactive to March 9, 2020." *Id.*

"Whereas negligence is 'the failure to exercise ordinary or reasonable care' that leads to a natural and probable injury, gross negligence is 'the failure to exercise slight care or diligence.'" *Moretz v. Trs. of Princeton*, No. 21-19822, 2023 WL 9017155, at *5 (D.N.J. Dec. 29, 2023)

---

[8] To reach the opposite conclusion, Defendants cite to an HHS Advisory Opinion ("AO") asserting that the non-use of a countermeasure could give rise to PREP Act immunity. U.S. Dep't of Health & Hum. Servs., Advisory Opinion No. 21-01 on the PREP Act Scope of Preemption Provision (Jan. 8, 2021). The AO notes the PREP Act "extends immunity to anything 'relating to' the administration of a covered countermeasure." *Id.* at 3. This is unpersuasive. Agency advisory opinions do not have the force of law, the AO cites no authority supporting its broad reading of the PREP Act, it appears affirmatively inconsistent with the plain language of the Act, and "a plethora of other courts have likewise rejected its expansive interpretation." *Testa*, 622 F. Supp. 3d at 11. *See also Beaty v. Delaware County.*, No. 21-1617, 2021 WL 4026373 (E.D. Pa. Aug. 5, 2021) (rejecting AO's interpretation of PREP Act); *Hatcher v. HCP Prairie Vill. KS OPCO LLC*, 515 F. Supp. 3d 1152, 1161-62 (D. Kan. 2021) (same); *Jones v. Legacy Mgmt. Grp. of La. LLC*, No. 21-838, 2021 WL 3416993, at *3 (W.D. La. July 7, 2021) (noting AO "cites no supporting authority for its interpretation and explicitly states that it does not have the force or effect of law.").

(quoting *Steinberg v. Sahara Sam's Oasis, LLC*, 142 A.3d 742, 754 (N.J. 2016)). "Although gross negligence is something more than 'inattention' or 'mistaken judgment,' it does not require willful or wanton misconduct or recklessness." *Steinberg*, 142 A.3d at 754 (citation omitted). In other words, the difference between ordinary and gross negligence is a matter of degree, and gross negligence "denotes 'the upper reaches of negligent conduct.'" *Id.* (quoting *Parks v. Pep Boys*, 659 A.2d 471, 478 n.6 (N.J. Super. App. Div. 1995)).

Taken as true, Defendants' failure to employ "any available measures, strategies or tactics to stop the spread of COVID-19" after the State and federal governments declared the pandemic a public health emergency falls within the upper reaches of negligent conduct. (SAC ¶¶ 22(k), 25(b)); *Powell v. Seton Hall Univ.*, No. 21-13709, 2022 WL 1224959, at *5 (D.N.J. Apr. 26, 2022) (finding plaintiff adequately alleged gross negligence by pleading defendant failed to provide effective treatment for severe knee injury). Accordingly, the New Jersey COVID-19 Immunity Statute does not, at this juncture, bar Plaintiffs' NHA claim.

In sum, the Court dismisses Plaintiffs' NHA claims predicated upon violations of N.J.S.A. 30:13-3 and N.J.A.C. 8:39-4.1 with prejudice.[9] And the Court dismisses Plaintiffs' NHA claim predicated upon violation of N.J.S.A. 30:13-5(m) without prejudice.[10] But the Court denies Defendants' motion to dismiss as to Plaintiffs' claims under N.J.S.A. 30:13-5(j).

      *iii.    Consumer Fraud Act*

The CFA "targets unlawful sales and advertising practices designed to induce customers to purchase merchandise or real estate." *Maher v. AMAG Pharm., Inc.*, No. 20-152, 2024 WL

---

[9] Because the NHA private cause of action does not extend to violations of a nursing home's responsibilities or regulations, amending these claims would be futile. *Phillips*, 515 F.3d at 236.

[10] By contrast, Plaintiffs' N.J.S.A. 30:13-5(m) claim is not legally insufficient on its face. *J.W.S. Delavau Co.*, 106 F. Supp. 2d at 764. Rather, Plaintiffs have failed to adequately allege how they were deprived of rights solely by reason of their admission to Andover I and II.

1376685, at *17 (D.N.J. Mar. 28, 2024) (quoting *Sun Chem. Corp. v. Fike Corp.*, 981 F.3d 231, 236 (3d Cir. 2020)). The CFA prohibits

> The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

N.J.S.A. 56:8-2. Merchandise "includes services." *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 267 (3d Cir. 2008) (quoting N.J.S.A. 56:8-1(c)). But "learned professionals" who render services to the public are "beyond the reach of the [CFA] so long as they are operating in their professional capacities." *Macedo v. Dello Russo*, 840 A.2d 238, 242 (N.J. 2004); *see also DiCarlo*, 530 F.3d at 267 ("New Jersey courts have consistently held that professionals are not covered by the [CFA]."). "The rationale underlying the learned professionals exception is that uniform regulation of an occupation, where such regulation exists, could conflict with regulation under the CFA." *Lee v. First Union Nat. Bank*, 971 A.2d 1054, 1062 (N.J. 2009). Moreover, "the exception extends to matters 'affecting' professional services." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-2904, 2021 WL 5937742, at *23 (D.N.J. Dec. 16, 2021) (citation omitted). This includes activities such as billing and advertising. *See Macedo*, 840 A.2d at 241-42 (advertising); *DiCarlo*, 530 F.3d at 267-68 (billing). "Those who have been exempted from NJCFA claims include physicians, lawyers, dentists, accountants, and engineers." *Riad v. Dey Equine Veterinarians, P.A.*, No. 22-6927, 2023 WL 7648714, at *9 (D.N.J. Nov. 15, 2023). The exception extends to nursing homes.[11] *See Manahawkin Convalescent v. O'Neill*, 43 A.3d 1197, 1204 (N.J. Super. App. Div. 2012), *aff'd*, 85 A.3d 947 (N.J. 2014).

---

[11] The New Jersey Supreme Court did not reach the issue of whether nursing homes were "learned professionals" because the Supreme Court concluded the nursing home did not commit an unlawful practice under the CFA. *See*

16

Plaintiffs argue the "learned professionals" exception to the CFA does not apply to Defendants, and even if it did, Defendants' misleading advertising about the quality of care did not fall within the exception. Neither argument is persuasive. To start, in New Jersey, the learned professionals exception *does* encompass nursing homes. *Manahawkin Convalescent*, 43 A.3d at 1204. "[N]ursing home facilities, particularly those accepting patients who receive federally funded medical assistance, Medicare and Medicaid, are strictly regulated." *Id.* And "[t]he New Jersey Department of Health and Senior Services is authorized to maintain an action in the name of the State to enforce the provisions of the NHA and any rules or regulations promulgated pursuant to the NHA." *Id.* Thus, "[a]pplying the CFA to [a nursing home], which . . . is subject to state regulation, would create an impermissible circumstance where divergent determinations and penalties for the same subject matter may occur." *Id.* The Court declines the invitation to create such a circumstance.

Moreover, Plaintiffs' attempts to distinguish Defendants' advertisements from conduct within the "learned professionals" exception falls flat. It is well-established that "advertisements by learned professionals in respect of the rendering of professional services are insulated from the CFA." *Macedo*, 840 A.2d at 242. Defendants are learned professionals. Their advertising does not fall within the sweep of the CFA. Accordingly, the Court dismisses Plaintiffs' CFA claim with prejudice.[12]

---

*Manahawkin Convalescent*, 85 A.3d at 962. In dicta, the Supreme Court expressed doubt "the billing and collection function at issue in this case would qualify for the learned professional exception." *Id.* But *Manahawkin Convalescent* involved "who was responsible for payment of the nursing home's bill," not advertisements. *Atl. Ambulance Corp. v. Cullum*, 166 A.3d 260, 265 (N.J. Super. App. Div. 2017).

[12] The Court dismisses Plaintiffs' CFA claim with prejudice because Plaintiffs have, on three occasions, failed to adequately allege facts supporting a CFA claim. Further amendment is likely futile. *Phillips*, 515 F.3d at 236.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' unopposed motion to dismiss Emerson (ECF No. 79) is **GRANTED**, and Defendants' motion to dismiss the Second Amended Complaint (ECF No. 59) is **GRANTED in part.** Count I (negligence *per se*); Count II (NHA), to the extent it arises under N.J.S.A. 30:13-3 and N.J.A.C. 8:39-4.1; and Count III (CFA) of the Second Amended Complaint are **DISMISSED** *with prejudice*. Count II, to the extent it arises under N.J.S.A. 30:13-5(m), is **DISMISSED** *without prejudice*. Defendants' motion to dismiss is **DENIED** as to Count II, to the extent it arises under N.J.S.A. 30:13-5(j). An appropriate Order accompanies this Opinion.

**DATED: 11/5/2025**

_____
HONORABLE JULIEN XAVIER NEALS
United States District Judge